**UNITED STATES of America,**
**Plaintiff-Appellee,**

**v.**

**Armando ARIAS–DIAZ, Delfin Hondares-Alfaro, Octavio Pino-Villa, Pedro Alvaro Zarzabal-Naranjo, Mario Orlando Curbelo-Talvara and Jose Quinones-Pita, Defendants-Appellants.**

**No. 73–2463.**

United States Court of Appeals,
Fifth Circuit.

July 18, 1974.

Tyce S. Smith, Chicago, Ill., for Curbelo-Talvara and Pino-Villa.

George B. Weires, Miami, Fla., for other defendants-appellants.

John L. Briggs, U. S. Atty., Robert S. Yerkes, Asst. U. S. Atty., Jacksonville, Fla., for plaintiff-appellee.

Before WISDOM and GOLDBERG, Circuit Judges, and LYNNE, District Judge.

WISDOM, Circuit Judge:

About 5 a. m., January 10, 1973, United States customs agents stopped four cars traveling together near the Leesburg Airport, Florida. The agents arrested six persons caught redhanded with a total of 1947 pounds of marijuana. The defendants-appellants, Arias, Hondares, Pino, Zarzabal, Curbelo, and Quinones,[1] were indicted, each on three charges of violating the marijuana laws: conspiring to import and distribute marijuana; knowingly and intentionally importing marijuana; and knowingly and intentionally possessing marijuana with the intent to distribute it. See 21 U.S. C. §§ 841(a)(1), 952(a), 960(b), 963 and 18 U.S.C. § 2. The defendants were tried together. Pino and Curbelo were convicted on all three counts. The other defendants were convicted only of possession of the marijuana. All appeal. We reverse the conviction of Zarzabal and affirm the convictions of the other five.

I.

Juan Ortiz, an airplane pilot, was a government informer and the chief government witness. He testified that on December 7, 1972, he met with an alleged narcotics smuggler from Colombia, Raul Gonzales, at a hotel in Miami, Florida. Ortiz had met Gonzales through Curbelo. In the hotel lobby Ortiz was introduced to Nacre Dace, another alleged marijuana dealer from Colombia. Dace later asked Ortiz to introduce him to Curbelo. Ortiz informed Curbelo that "there was a person from Colombia who wanted to see him". Curbelo suggested that they meet in his trailer. The meeting took place at 11 a. m. the next morning; Curbelo, Ortiz, Dace, and Pino were present. Dace said that a friend of Curbelo's needed money and had about 1800 pounds of marijuana in Colombia for sale. Curbelo agreed to pay Ortiz $55,000 to fly to Colombia to pick up the marijuana and bring it back into the United States. Curbelo was to send $36,000 with Ortiz as partial payment for the shipment and later pay another $36,000 to complete the deal.

Curbelo gave Ortiz several hundred dollars to make a deposit on the rental of an airplane, and later Curbelo and Pino brought Ortiz $2,500 to cover rental of the plane and other expenses. They told Ortiz how to make the connection in Colombia. Arrangements were also made for Ortiz to be met at Leesburg, Florida, upon his return from Colombia. Ortiz was to pick up a car parked near the landing field at Leesburg and drive it to the local Holiday Inn. He would be met there by Pino and Curbelo. Ortiz divulged the plan to United States customs agents.

Ortiz flew from Miami to Colombia, as planned, and picked up 24 boxes of marijuana, disguised as cartons of cigarettes. He then flew to Kingston, Jamaica. After speaking with a customs agent, he flew on to Marathon, Florida, where he refueled and flew on to Leesburg. When he landed at Leesburg, he was unable to find the appointed car, and he was unable to locate Pino or Curbelo at the Holiday Inn. He then taxied to a remote area of the airport, dumped the 24 boxes of marijuana on the ground, and flew to Miami. At that time his plane was fully inspected by U. S. Customs agents and found not to contain any type of drugs. When he arrived at his home in Miami at about 3 a. m., January 10, he learned from his wife that Pino had called. Pino called again between 3:30 and 4 a. m. He said that he was at the Leesburg Airport and asked where the marijuana was. Ortiz told him that it was at the end of the east-west runway.

Fifteen customs agents were at the Leesburg Airport in the early morning

---

1. We refer to the defendants-appellants by shortened names, as they are referred to in the record and briefs.

hours of January 10, 1973. At about 4:30 a. m. four cars pulled up and parked near the east-west runway. Half an hour later three of those cars proceeded to the area where Ortiz had left the cartons of marijuana. When the cars departed shortly thereafter, the cartons were gone. As these automobiles left the airport, they were joined by a fourth. Customs agents, who had been staked out at the airport, stopped all four cars. Curbelo, the driver of the fourth car, had none of the cartons; he did have two .38 caliber snub-nosed revolvers in the trunk of his car. Pino, with a passenger unidentified at trial, was driving a car containing nine cartons. Hondares, with Quinones as a passenger, had eight. The remaining car contained seven cartons. The driver was not identified at trial. Customs agents did not show that Zarzabal or Arias was in any of the vehicles stopped; nor did the agents identify them as being at the airport.

## II.

At the close of the Government's case, all of the defendants moved for judgments of acquittal on all counts. The motions were denied. Zarzabal now argues that the court erred in denying his motion.

■ The test to be applied by the trial court in passing on a motion for judgment of acquittal "is whether, taking the view most favorable to the Government, a reasonably-minded jury could accept the relevant evidence as adequate and sufficient to support the conclusion of the defendant's guilt beyond a reasonable doubt." United States v. Jeffords, 5 Cir. 1974, 491 F.2d 90, 91; United States v. Knox, 5 Cir. 1972, 458 F.2d 612, 615, cert. denied, 409 U.S. 845, 93 S.Ct. 48, 34 L.Ed.2d 85; Jones v. United States, 5 Cir. 1968, 391 F.2d 273, 274. The judge is to direct acquittal "if the evidence is insufficient to sustain a conviction". Fed.R.Crim.P. 29(a).

■ The court erred in denying Zarzabal's motion to dismiss and in submitting the case against him to the jury. There was no evidence in the Government's case-in-chief to implicate Zarzabal directly. One of the customs agents, Mason, identified Pino as the driver of one of the cars and stated that there was a passenger, but he could not remember the passenger's name. The Government asks us to infer from this bald statement that the passenger was Zarzabal. We cannot draw this inference. Nor are we inclined to follow the Government's suggestion that testimony establishing that six suspects were arrested and that "all the defendants" were taken into Leesburg Municipal Courtroom and advised of their rights was sufficient to support a reasonable jury finding of Zarzabal's guilt beyond a reasonable doubt. This is not "substantial evidence" to support the verdict. See United States v. Jackson, 5 Cir. 1971, 444 F.2d 1389.

■ The Government also argues that Zarzabal waived appellate consideration of the denial of his motion for acquittal when his codefendant, Arias, testified and supplied deficiencies in the Government's case. Arias took the stand and attempted to raise a defense that he had no knowledge that the packages contained marijuana. During his testimony he mentioned that about 1 a. m. on January 10, 1973, he rented a room at the Holiday Inn in Leesburg, Florida, for Zarzabal and himself. It is problematical whether this testimony added enough to the nascent case against Zarzabal to permit it to go to the jury.[2] In any event, we cannot accept Arias's testimony as representing Zarzabal's waiver of consideration of the motion for acquittal. The rule is well-recognized in this circuit that a defendant who testifies *himself* and supplies deficiencies in the Government's case waives appellate review of a denial of his motion for judgment of acquittal at

---

2. Zarzabal renewed his motion for acquittal at the close of all the evidence. See Fed.R.Crim. P. 29(2).

the close of the Government's case.[3] See United States v. Jackson, *supra*, 444 F. 2d at 1389; United States v. Rawls, 5 Cir. 1970, 421 F.2d 1285. We adhere to it. But that doctrine should not be extended to imply waiver when a codefendant testifies. See Cephus v. United States, 1963, 117 U.S.App.D.C. 15, 324 F.2d 893, 897.

### III.

The appellants argue that through the activities of Ortiz, the informer, the Government's role was so integral a part of the criminal enterprise as to be repugnant to the criminal justice system and deprive the appellants of due process. They are careful not to couch this argument as entrapment. The theory, once increasingly relied on by defendants, that entrapment exists as a matter of law when there is "an intolerable degree of governmental participation in the criminal enterprise" was cut short by the 1973 Supreme Court decision United States v. Russell, 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366. In *Russell* the Court reaffirmed the classic predisposition test for entrapment: "It is only when the government's deception actually implants the criminal design in the mind of the defendant that the defense of entrapment comes into play." 411 U.S. at 436. The Court did not rule out the possibility however, that it might "some day be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction." *Id.* at 431–432. The appellants here contend that that day has now arrived, ushered in by the case at bar.

We need not lay out a detailed account of Ortiz's role to dispose of the appellants' argument on this point. Their attempt to impart life to the theory, discredited in *Russell*, that government involvement in criminal activity bars prosecution must fail. It is clear that the situation envisioned by the Supreme Court in *Russell* to require reversal involved more than the presence of a government informer in the scheme and his supplying a not uncommon, though essential, skill, such as here the ability to fly a plane.[4] And we think that the "outrageous" conduct postulated by the Court must be more than carrying messages and thereby facilitating the meeting of criminal minds. These mark the extent of Ortiz's contribution. To require reversal, the Government's conduct must violate that " 'fundamental fairness, shocking to the universal sense of justice,' mandated by the Due Process Clause of the Fifth Amendment". *Id.* at 432, quoting Kinsella v. United States ex rel. Singleton, 1960, 361 U.S. 234, 246, 80 S.Ct. 297, 4 L.Ed.2d 268. Where that threshold may lie, we are not required to say in this case. But the Government has certainly not crossed it here.

### IV.

Quinones, Pino, and Curbelo argue that the trial court erred in permitting, over strenuous objection, certain evidence of other criminal acts of the defendants to be admitted. The evidence complained of related to two different transgressions. First, Ortiz implicated Pino and Curbelo in an earlier scheme to import marijuana.[5] Second, Ortiz testi-

---

3. Presumably for this reason, Arias, against whom the evidence produced in the Government's case-in-chief was weak, has not appealed the denial of his motion for acquittal.

4. The Government's supplying pilot's skills is similar to the Government's supplying in *Russell* a scarce, though legal, chemical used in the manufacture of methamphetamine ("speed"). It is very different from the Government's providing the contraband, "the

possession or distribution of which constitutes the very substance of the crime". United States v. Oquendo, 5 Cir. 1974, 490 F.2d 161, 163; see United States v. Bueno, 5 Cir. 1971, 447 F.2d 903.

5. The district court instructed the jury that the testimony with regard to this earlier importation of marijuana applied only to Pino and Curbelo.

Ortiz also mentioned that he and Quinones had "conversations leading on a flight to

fied that weeks after the arrests were made near the Leesburg Airport, Pino and Quinones separately communicated to him that someone must have informed the Government as to the time the marijuana would be arriving in Leesburg. Each stated that when he discovered who the informer was, he would kill him. Ortiz related that Quinones had implied that the threats came from Pino and Curbelo, but that Quinones felt the same way.

■■ The general rule, well-settled, is that evidence of offenses not charged in the indictment is not admissible. Weiss v. United States, 5 Cir. 1941, 122 F.2d 675, 682, cert. denied, 314 U.S. 687, 62 S.Ct. 300, 86 L.Ed. 550. There are, however, exceptions, also well-settled. See Ehrlich v. United States, 5 Cir. 1956, 238 F.2d 481, 484. Taken together, the rule and the exceptions teach that although the prosecution cannot use evidence of other crimes to show the defendant's propensity to commit the crime charged, it can use it for another relevant purpose. United States v. Abshire, 5 Cir. 1972, 471 F.2d 116, 118. Here the testimony helped to prove that the defendants were part of a conspiracy to import marijuana illegally. For this purpose it was properly admissible. See United States v. Gonzalez, 5 Cir. 1974, 491 F.2d 1202, 1205; United States v. Nakaladski, 5 Cir. 1973, 481 F.2d 289, 296. The challenged testimony illuminated the character of the conspiracy and the extent of the involvement of the participants. Specifically, the testimony relating to the earlier marijuana load cast light on the duration of Pino's and Curbelo's association and the objects of their joint activities. See Devoe v. United States, 8 Cir. 1939, 103 F.2d 584, 589, cert. denied, 308 U.S. 571, 60 S.Ct. 84, 84 L.Ed. 479. The threats tended to reaffirm the extent of Pino's involvement, in addition to showing Quinones's role.

This is not a case where the evidence was introduced to prove an element not *"a critical ingredient of the offense charged"*. United States v. Goodwin, 5 Cir. 1974, 492 F.2d 1141, 1151, quoting Hamilton v. United States, 5 Cir. 1969, 409 F.2d 928, 930 (emphasis in original). Proof of the existence of the conspiracy, of course, is an essential first step in proving the crime of conspiracy. The existence and membership of the conspiracy were definitely at issue here. Compare *Goodwin*. We hold that it was within the trial court's discretion to admit the challenged evidence as tending to establish the conspiracy charged. See United States v. Fonseca, 5 Cir. 1974, 490 F.2d 464, 469; United States v. Abshire, *supra*, 471 F.2d at 118; Devoe v. United States, *supra*, 103 F.2d at 588–589.

### V.

■ Pino and Curbelo further argue that they were denied their sixth amendment right of confrontation when the trial court permitted, over objection, the introduction of hearsay testimony implicating them in the threat made by Quinones to Ortiz. The district judge admitted the testimony on the theory that it satisfied the federal co-conspirator exception to the hearsay rule. Although we agree with the appellants that the district court erred in admitting the testimony, we do not find the error so prejudicial as to require reversal.

■■ The federal co-conspirator exception permits the introduction of hearsay statements "by a co-conspirator of a party during the course and in furtherance of the conspiracy". Federal Rules of Evidence, Rule 801(d)(2)(E) (1972); 3 Wharton's Criminal Evidence § 642 (13 ed. 1973). To be admitted under the exception, the statements must be made in furtherance of the "main aim" of the conspiracy; statements made in efforts to prevent detection and

---

Colombia to 'brought' a load of drugs from Colombia". After objection the court in-

structed the jury that the comment would be stricken from its consideration.

punishment are inadmissible. Krulewitch v. United States, 1949, 336 U.S. 440, 444, 69 S.Ct. 716, 93 L.Ed. 790. Furthermore, hearsay statements made by an alleged co-conspirator after his arrest are generally inadmissible against all but the defendant. Lutwak v. United States, 1953, 344 U.S. 604, 618, 73 S.Ct. 481, 97 L.Ed. 593; Hamilton v. United States, 1970, 139 U.S.App.D.C. 368, 433 F.2d 526, 530, cert. denied, 402 U.S. 944, 91 S.Ct. 1612, 29 L.Ed.2d 112. For a person's role in a conspiracy ends with his arrest. See United States v. Harrell, 5 Cir. 1970, 436 F.2d 606, 613, cert. denied, 409 U.S. 846, 93 S.Ct. 49, 34 L.Ed. 2d 86.

Quinones was arrested in Leesburg on January 10, 1972. His threat to Ortiz, and implication of Pino and Curbelo, occurred about five weeks later. Because Quinones's role as a co-conspirator in the marijuana smuggling ended with his arrest, his declarations made later should not have been admitted against Pino and Curbelo. The trial judge's admission of the testimony seems to violate the federal hearsay rule.[6]

■ We hold, however, that the error does not rise to constitutional proportions. See United States v. Fischetti, 5 Cir. 1971, 450 F.2d 34, 41, cert. denied, 405 U.S. 1016, 92 S.Ct. 1290, 31 L. Ed.2d 478. In California v. Green, 1970, 399 U.S. 149, 155–156, 90 S.Ct. 1930, 26 L.Ed.2d 489, and Dutton v. Evans, 1970, 400 U.S. 74, 81–82, 91 S.Ct. 210, 27 L. Ed.2d 213, the Supreme Court observed that the hearsay rule and the confrontation clause of the sixth amendment are not congruent. Testimony may violate the hearsay rule without violating the Constitution. Here, because the declarant Quinones was a defendant, he was not available to be called by the prosecution. See United States v. Burke, 5 Cir.

1974, 495 F.2d 1226. Moreover, though in violation of the hearsay rule, the testimony implicating Pino and Curbelo in the threat was not crucial to the Government's case or devastating to the defendants. See Dutton v. Evans, *supra*, 400 U.S. at 87; United States v. Burke, 495 F.2d 1226. The other evidence against Pino and Curbelo was solid and virtually compelled a jury finding of guilt beyond a reasonable doubt on all counts. Pino and Curbelo were present at the first meeting, at which plans for the January marijuana caper were laid. There Curbelo agreed to buy the Colombian marijuana and to arrange for it to be flown to the United States. Together Pino and Curbelo brought Ortiz $2,500 to rent the airplane to be used to import the marijuana. Pino telephoned Ortiz upon the latter's return from Colombia, inquiring where the marijuana might be found. And both were arrested in close proximity to almost a ton of marijuana on January 10, 1973. Finally, Pino made an independent threat to Ortiz. At most, the questioned testimony was "peripheral". See Dutton v. Evans, *supra*, 400 U.S. at 87.

■ Because we find no constitutional error, we use the traditional standard to determine whether the error was harmless. Compare Chapman v. California, 1967, 386 U.S. 18, 24, 87 S. Ct. 814, 17 L.Ed.2d 705 (constitutional error) with Kotteakos v. United States, 1946, 328 U.S. 750, 764–765, 66 S.Ct. 1239, 90 L.Ed. 1557 (nonconstitutional error). The standard applicable to nonstitutional error was stated in *Kotteakos*:

> If, when all is said and done, the conviction [court] is sure that the error did not influence the jury, or had but very slight effect, the verdict and the judgment should stand . . .

---

6. In response to a defense objection to the hearsay nature of Ortiz's testimony, the trial judge said:

> Well, he's allowed to testify as to any conversation that any of these defendants might have had with him or he had with them if he will specifically identify them and confine it to that conversation at a period of time somewhere near the period of time covered by the indictment . . .

This is not the rule.

But if one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected. The inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand.

328 U.S. at 764–765. See Fed.R.Crim.P. 52(a).

■ The standard for determining the harmlessness of error under *Kotteakos* is more strict than that for determining whether the admission of hearsay testimony violates the confrontation clause under *Dutton*. In other words, hearsay testimony that is neither "crucial" nor "devastating" under *Dutton* may nevertheless amount to reversible error under *Kotteakos*. In the case before the Court, however, the evidence against Pino and Curbelo was overwhelming. We conclude that the hearsay testimony, even if improperly admitted, had no substantial effect on the verdict.

### VI.

The appellants raise six other contentions. They maintain that (1) the evidence was insufficient to convict Pino and Curbelo of unlawfully importing marijuana; (2) the Government failed to correct perjurous statements of Ortiz, the chief government witness; (3) the Government violated a pretrial discovery order by not disclosing to the appellants an oral exculpatory statement made by Curbelo at the time of his arrest; (4) the Government failed to tender reports of the Government's expert witnesses to the appellants; (5) the district court erred by admitting evidence of post-indictment conversations between Ortiz and appellants Pino and Quinones; and (6) the trial court abused its discretion in denying Curbelo's motion for severance. We have carefully considered these contentions, and we find them to be without merit.

Affirmed in part, reversed in part.